**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cr-372-12 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| PARTAGNAN BURCH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On June 28, 2023, Chicago police officers and federal agents served an arrest warrant for Defendant Partagnan Burch at his girlfriend Shaquera Sims's high-rise apartment. After they gained entry to the apartment, the officers conducted a limited sweep of the unit. They did not find Mr. Burch in the initial search, but they did find a pistol under his bed. In part on the basis of that pistol, the officers obtained a search warrant for Ms. Sims apartment, which resulted in the discovery of several guns and about a kilogram of cocaine.

Before the Court today is Mr. Burch's motion to suppress the evidence recovered from Ms. Sims's apartment. The Court rules that the officers had a reasonable basis to believe that Mr. Burch was inside the apartment, and that their discovery of the pistol under the bed was the product of a reasonable search for Mr. Burch and therefore did not violate the Fourth Amendment. Additionally, despite its many errors, made with reckless disregard for the truth, the Court finds that the affidavit used to obtain the search warrant still supports a finding of probable cause. Accordingly, the Court denies the motion in full.

## BACKGROUND

Unless otherwise indicated, the following facts are drawn from the uncontested evidence presented at the hearing to adjudicate Mr. Burch's motion to suppress evidence.

Mr. Burch is one of thirteen defendants accused of participating in and contributing to a Chicago-based drug trafficking organization once known as the Travelling Vice Lords. The investigation that led to Mr. Burch's arrest was a joint operation between the U.S. Department of Homeland Security and the Chicago Police Department (CPD). On June 26, 2023, the Government filed a criminal complaint against Mr. Burch and the twelve other Vice Lords defendants. Arrest warrants were issued for all defendants that day, with four search warrants obtained as well. The plan was to execute all warrants at the same time.

**Executing the Arrest Warrant**

The warrant for Mr. Burch stated that his last known address was a high-rise apartment located at 2138 South Indiana Avenue in Chicago. The official tenant of this apartment was Mr. Burch's girlfriend, Shaquera Sims. However, Mr. Burch had previously been observed in the location, and the government possessed significant cell phone location data from June 19 to 23, 2023, showing that Mr. Burch was frequently in the unit or nearby. However, the Government only obtained an arrest warrant for Mr. Burch, not a search warrant.

Two days later, on June 28, 2023, at about 6:00 a.m., officers from CPD and Homeland Security Investigations (HSI) prepared to arrest Mr. Burch. Reconnaissance from earlier that morning showed that cars linked to Mr. Burch and Ms. Sims were parked in the apartment building's garage. However, the police did not have definitive proof that Mr. Burch was inside the building. The officers entered the building, presented their warrant to the doorman, and assembled outside Ms. Sims's unit on the 22nd floor. The officers knocked loudly but received no response other than incessant barks from a dog inside the unit. At 6:02 a.m., the officers called Mr. Burch's cellphone, but they did not

– 2 –

hear a phone ringing inside. After three minutes, CPD Sgt. Xiques went back to the front desk to request a key. The attendant at the front desk did not want to provide a key, given that Mr. Burch was not listed as a resident of the unit, but Sgt. Xiques convinced him otherwise by saying that the police might need to break open the door if keys could not be obtained.

By 6:07 a.m., the building's chief engineer met the officers assembled outside Ms. Sims's unit. Following their direction, he knocked on the door and announced "Maintenance, you have a leak!" As the officers admitted on the stand, this was a lie to try to convince anyone inside to open the door. But they did not fall for the ruse. The officers then directed the engineer to put the keys in the lock and jiggle them, again to try to trick someone inside to open the door. At 6:08 a.m., Ms. Sims responded to the knocking and inquiries outside her unit. The officers verbally identified themselves as police with an arrest warrant for "Burch" and told Ms. Sims to open the door. They also threatened to kick open the door if she did not comply. She stated that she didn't have any clothes on and that the police did not have permission to enter her apartment. The officers told her to get dressed, and that they would be coming in afterward. A few minutes of silence followed, except for the perpetually yapping dog. CPD Sgt. Honda and CPD Det. Gallagher later testified that, during this time, they heard the sound of a toilet flushing and the footsteps of multiple people.

At 6:11 a.m., the officers once again knocked on the door and directed Ms. Sims to open it. At 6:12 a.m., they again put the keys in the lock and jiggled them. A few seconds later, Ms. Sims opened the door and the officers entered the unit.

**Search Pursuant to the Arrest Warrant**

Once inside the unit, the officers began to search for Mr. Burch. CPD Officers Spacek and Bielma entered the bedroom, which contained a bed consisting of a mattress and box spring on top of a short bedframe. The bottom of the bedframe was a foot or less off the ground. Officer Bielma

lifted up the mattress (only), then got down on the floor to look under the bed. Finding nothing, he announced that no one was under the bed and then left the room.

Det. Gallagher initially searched the kitchen and living room. He opened several cabinets and the dishwasher but found nothing. He asked whether anyone had checked the bed, apparently unaware that Officers Spacek and Bielma had already done so. Ms. Sims, who was standing by the doorway, said something to the effect of "Yeah, like a grown-ass person…," indicating that she did not believe an adult could fit under the bed. From the officers' testimony and body-worn camera ("BWC") footage, it is unclear whether anyone heard her say this. Det. Gallagher and Sgt. Honda then saw Ms. Sims walk into the bedroom, get down on the floor, look under the bed, and stand up. Det. Gallagher entered the bedroom and lifted the mattress, discovering several documents, including a passport belonging to Mr. Burch. Det. Gallagher then lifted the mattress and box spring together, exposing the floor underneath the bed and bedframe. Under the bed was a pistol, later identified to be a MasterPiece Arms MPA Defender 9mm semi-automatic pistol with serial number FX29363. The gun had a bullet in the chamber, an expanded magazine, and an attached silencer. After this, the officers concluded that Mr. Burch was not in the unit, and they refrained from any further search of the apartment until a search warrant could be obtained. In all, the initial search of the apartment lasted about four minutes.

The officers later reviewed footage from cameras on a hotel across the street, which showed that Mr. Burch had fled the apartment by jumping from Ms. Sims's balcony to the balcony of the unit below. Dkt. 538 at *6 [hereinafter Gov. Resp.]. He then concealed himself with a tarp. At approximately 7:15 a.m., the officers gained access to the lower unit, where they arrested Mr. Burch.

**Search Pursuant to the Search Warrant**

After the officers determined that Mr. Burch was not in Ms. Sims's apartment, they decided to apply for a search warrant. The affiant for the warrant was HSI Special Agent Christopher Perugini, one of the federal case agents on the investigation. Agent Perugini was not present during the

execution of the arrest warrant; he was instead at the command center, overseeing the simultaneous execution of arrest warrants for all thirteen defendants, along with four additional search warrants. Despite his lack of direct observational knowledge, Agent Perugini and the prosecutors decided that he should be the affiant because of his experience investigating narcotics offenses.

The affidavit consisted of two primary portions. The first reiterated the drug trafficking charges from the criminal complaint against Mr. Burch, which led to the issuance of his arrest warrant. The second section outlined the evidence that led the officers to believe that Mr. Burch could be found at Ms. Sims's apartment and then proceeded to describe the execution of the arrest warrant. The second section concluded with the officers' discovery of Mr. Burch on the lower balcony and his arrest. The information from Ms. Sims's unit was gathered by HSI Special Agent Matt Cotiguala, who accompanied the CPD officers during the execution of the arrest warrant. Agent Cotiguala worked with the prosecutors to draft the affidavit. He reviewed the draft with Agent Perugini, who then signed and submitted the affidavit with the search warrant application. Magistrate Judge Heather McShain, who had previously signed Mr. Burch's arrest warrant, granted the warrant to search Ms. Sims's unit. Upon approval of the warrant, the officers began to search Ms. Sims's apartment exhaustively. By the end of the search, they had uncovered over a kilogram of cocaine, $4,400 cash, four additional firearms (including a long rifle and a tactical shotgun), and assorted drug paraphernalia. Gov. Resp. *10–11.

**Procedural History**

Mr. Burch made his initial appearance before Judge McShain on June 28, 2023, the date of his arrest. Dkt. 56. On July 6, 2023, Judge McShain granted the Government's motion for pretrial detention. Dkt. 112. On August 30, 2023, the Government obtained an indictment of Mr. Burch and the other Vice Lords defendants, dkt. 165, which was subsequently replaced on June 12, 2024 with a superseding indictment, dkt. 300. Mr. Burch has been charged with conspiracy to distribute multiple narcotics; possession of cocaine with intent to distribute on April 1, 2023 (before the execution of his

– 5 –

arrest warrant); possession of cocaine with intent to distribute on June 28, 2023 (the date of his arrest); and possession of five firearms (the one found at Ms. Sims's apartment) in furtherance of the conspiracy to distribute narcotics. *Id.* Mr. Burch has pled not guilty to all charges, dkt. 195; dkt. 323, and is presumed innocent until proven guilty. His trial is currently set for October 5, 2026; he will be tried with three other co-defendants. Dkt. 693.

On September 12, 2025, Mr. Burch filed the instant motion to suppress evidence obtained from Ms. Sims's apartment. Dkt. 515 [hereinafter Def. Br.]. He requested a hearing to determine whether the parameters of the search pursuant to the arrest warrant exceeded the bounds of the Fourth Amendment; and also whether the affidavit supporting the search warrant should be invalidated pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The Court set a hearing for the motion to suppress and later clarified that "the upcoming suppression hearing for Defendant Burch will, in the interests of judicial expediency, also be a hearing pursuant to *Franks*… to evaluate Mr. Burch's allegations of omissions and misrepresentations in the affidavit for search warrant." Dkt. 624. The hearing, which ran longer than expected, began on March 19, 2026, continued on to the next day, and finally concluded on April 28, 2026. In lieu of closing arguments, both parties submitted post-hearing briefs, after which the Court took the motion under advisement.

## DISCUSSION

Mr. Burch has moved to suppress all evidence obtained from Ms. Sims's apartment. The three primary questions are: (1) whether the officers lawfully entered the apartment; (2) whether the officer's search under the bed, which discovered a pistol, exceeded the bounds of a search pursuant to an arrest warrant; and (3) whether the affidavit submitted in support of the search warrant contained so many errors that it cannot be said to support a finding of probable cause. The Court ultimately rules against Mr. Burch on all three questions.

### I.      Entry into the Apartment

Mr. Burch argues that the officers did not have legal authority to enter his residence, Ms. Sims's apartment, and that therefore all evidence secured from it must be suppressed. A critical fact here is that the officers only had an arrest warrant, not a search warrant. An arrest warrant establishes that probable cause exists to arrest a given person for a given crime; it does not, by itself, permit entry into any private space.[1] However, the warrant "carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 602 (1980).

It is not yet settled in this circuit whether "reasonable belief" is a lower standard than probable cause. *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009). But even if reasonable belief is the same as probable cause, the Court finds that the officers did not violate the Fourth Amendment when they entered the unit. Probable cause exists when "there are facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person… in believing" that a suspect is in a particular area. *United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011) (internal quotation marks omitted). Probable cause, it should be noted, is not a "more likely than not" standard; in this situation, it merely asks whether a hypothetical prudent person would be justified in believing that Mr. Burch was in the unit, such that a search of the unit for him becomes reasonable under the Fourth Amendment. *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 338 (7th Cir. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

---

[1] Of course, probable cause is not required if a resident gives permission to enter. Here, however, such permission was not present. Although Ms. Sims opened the door to her apartment, that action cannot be construed as giving consent to enter because it was in response to police threats to break down the door. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) ("[T]he Fourth and Fourteenth Amendments require that a consent [to search] not be coerced, by explicit or implicit means, by implied threat or covert force."); *Wiek v. City of Chicago*, No. 09 C 920, 2012 WL 366569, at *4 (N.D. Ill. Jan. 30, 2012) (Hibbler, J.) ("[E]ven if [the defendant] did in fact 'submit' or 'acquiesce' to police authority… those actions cannot constitute voluntary consent because they were responsive to the officer's show of force.")

Here, probable cause is established by: (1) the significant evidence indicating that Mr. Burch could likely be found at Ms. Sims's apartment and that the apartment might be his primary residence; (2) the time of day (people are more likely to be home at 6:00 a.m.), *see United States v. Hayes*, 209 Fed. Appx. 548, 551 (7th Cir. 2006); (3) the presence of cars linked to Mr. Burch in the garage; and (4) Ms. Sims's obvious delay tactics, *see United States v. Martinez-Hipolito*, No. 25-5526, 2026 WL 622983 (6th Cir. Mar. 5, 2026). A prudent person possessed with the knowledge of these facts would find it reasonable to believe that Mr. Burch was in the unit. *Hanson*, 608 F.3d at 338 (7th Cir. 2010). Mr. Burch's arguments to the contrary mostly focus on the alleged goal of the officers to gain entry to the apartment by any means, including force if necessary. But whether that was the officers' intention is irrelevant, because the objective facts establish probable cause to enter. *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014). Mr. Burch successfully casts doubt on some of the proposed evidence that he was present in the unit; for example, the Court agrees it is highly unlikely that Sgt. Honda and Det. Gallagher could really discern the footsteps of multiple people inside the unit, particularly over the unceasing barking of the dog inside. But even without such evidence, probable cause still existed. As such, the officers did not violate the Fourth Amendment when they entered Ms. Sims's apartment to search for Mr. Burch.

## II.        Discovery of the Pistol

Mr. Burch next argues that the search under the bed, which resulted in the discovery of a MasterPiece pistol, exceeded the bounds of what the arrest warrant permitted. The background principle here is essentially the same as above. An arrest warrant only permits a limited search for a suspect; it does not authorize a free-wheeling search for evidence in places that the suspect could not reasonably be found. *Maryland v. Buie*, 494 U.S. 325, 330 (1990). If the police want to search a private location for evidence, then they need a search warrant, not just an arrest warrant. U.S. Const. amend. IV (warrants must "particularly describe[e]… the persons or things to be seized").

As an initial matter, Mr. Burch argues that Det. Gallagher was on a fishing expedition, as shown by his previous searches of locations where a person would be unlikely to be able to hide, such as the dishwasher. But as with almost all Fourth Amendment questions, the standard here is an objective one that takes only Det. Gallagher's knowledge into account, not his intentions. *See, e.g., al-Kidd*, 563 U.S. at 735; *Edwards*, 769 F.3d at 516. Thus, the question of whether Det. Gallagher violated the Fourth Amendment becomes a question of whether an officer in Det. Gallagher's place could reasonably believe that Mr. Burch could be hiding under the bed.

Mr. Burch makes much of a recent Seventh Circuit decision, *United States v. Walker*, 143 F.4th 889 (7th Cir. 2025). That case concerned a protective sweep of a bedroom conducted shortly after arresting a suspect. *Id.* at 894. The bedroom contained a mattress and box spring resting directly on the ground; the officers lifted them and discovered a pistol underneath. The court of appeals ruled that the search was invalid because it was not reasonable to believe that a person could be hiding under a box spring sitting directly on the floor. *Id.* at 898.

Mr. Burch argues that *Walker* directly controls here; he claims that no reasonable officer could have believed that he was hiding in the small space underneath the bed. Mr. Burch argues that "there was no conceivable way a human could hide in the mere centimeters of space between the floor and the bottom of the boxspring." Def. Br.. He also cites Ms. Sims's comment, "Yeah, like a grown-ass man…," which he argues expressed her disbelief that anyone could think it was possible to hide under the bed. Dkt. 722 at *5 [hereinafter Def. Post-Hr'g Br.]. If *Walker* controls, as Mr. Burch contends, then Det. Gallagher's search underneath the bed was unreasonable and in violation of the Fourth Amendment, and the evidence of the pistol would need to be suppressed. However, as the Government points out, it is significantly more plausible that a person would be hiding under a bedframe several inches off the ground than that a person would be hiding under a box spring lying flat on the floor. Def. Post-Hr'g Br. *18–19. The *Walker* court also distinguished its finding from a

scenario, closely resembling the one before the Court today, in *United States v. Bass*, where "the Sixth Circuit found reasonable a search underneath a bed in light of an officer's testimony that the bedframe was high enough for a person to hide underneath." *Walker*, 143 F.4th at 898 (citing 315 F.3d 561, 564 (6th Cir. 2002)). As such, it is not at all clear that *Walker* controls.

The Government also argues that given Mr. Burch's size (which in 2019 was 5'7" tall and 165 pounds, Gov. Resp. *18 n.5), it was possible for Mr. Burch to hide under the bed. Moreover, even if it was, in fact, physically impossible for Mr. Burch to hide under the bed, the Government claims that the search would still be permissible so long as it was reasonable under the circumstances for Det. Gallagher to think that it would be possible for someone of Mr. Burch's size to fit under the bed. *Id.* at *18 (citing *United States v. Green*, 560 F.3d 853, 856-57 (8th Cir. 2009)); *see United States v. Richmond*, 924 F.3d 404, 417 (7th Cir. 2019) (citation omitted) (reasonableness must account for uncertain circumstances during a search).

The Court agrees that the space under the bed appears quite small from photos and BWC footage submitted as evidence, and the Court also agrees with Mr. Burch's interpretation of Ms. Sims's comments. However, no evidence was submitted that contained a definitive measurement of the height of the bedframe. In contrast, Det. Gallagher and Sgt. Honda both testified that the space under the bed was large enough for a person to hide. They also testified that have experience with suspects hiding under beds; in other words, if under the bed is a possible hiding spot, then it is also a likely hiding spot.

The Court regards this as a close question. However, on the basis of the submitted evidence, the Court agrees that it was reasonable for Det. Gallagher to believe that Mr. Burch could be hiding under the bed. As such, the search under the bed was not unreasonable, and the discovery of the pistol did not offend the Fourth Amendment.

### III.    The Search Warrant Affidavit

The Fourth Amendment generally requires law enforcement to secure a warrant, particularly describing the place to be searched and the person or things to be seized, before conducting a search. U.S. Const. amend. IV; *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The essential protection of the warrant requirement lies in its mandate that the usual inferences reasonable people draw from evidence must be drawn "by a neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). A magistrate's determination of probable cause is given great deference on review, and the affidavit submitted in support of a granted warrant has a presumption of validity and truthfulness. *Franks*, 438 U.S. at 171. However, if a defendant makes a preliminary showing that the affidavit submitted in support of a warrant application contained identifiable, material falsehoods sufficient to undermine the magistrate's probable cause determination, then the defendant may request a special *Franks* hearing to adjudicate the claims. *Id.*

Under Seventh Circuit precedent, *Franks* requires suppression of any evidence obtained from a tainted warrant if the defendant establishes by a preponderance of the evidence that (1) the warrant affidavit contained false statements, or omitted material facts; (2) the affiant made the false statements or omissions either intentionally or with reckless disregard for the truth; and (3) the false statements or omitted facts render the affidavit insufficient to establish probable cause for the warrant. *United States v. A Residence Located at 218 3rd Street,* 805 F.2d 256, 258 (7th Cir.1986); *accord United States v. McNeese,* 901 F.2d 585, 593–94 (7th Cir. 1990), *overruled on other grounds by United States v. Westmoreland,* 240 F.3d 618, 632–33 (7th Cir. 2001).

As an initial matter, the Government confusingly argues in its post-hearing brief that "no *Franks* hearing should occur," despite the fact that the *Franks* hearing already happened. Gov. Br. *9. In response to clarification requests from the Government, the Court stated that "the upcoming suppression hearing for Defendant Burch will, in the interests of judicial expediency, also be a hearing

– 11 –

pursuant to *Franks*… to evaluate Mr. Burch's allegations of omissions and misrepresentations in the affidavit for search warrant." Dkt. 624. The Court will construe all relevant arguments made by the Government against holding a *Franks* hearing as arguments against suppressing the fruits of the search warrant pursuant to *Franks*.

### A.    False Statements and Omissions in the Affidavit

The Government has admitted that the affidavit contained several falsehoods and omissions. Specifically:

- The affidavit misidentified the person who provided keys to Ms. Sims's apartment as the building manager, rather than the head building engineer. Dkt. 515-1 ¶ 16 [hereinafter Aff.].

- The affidavit claimed the search was a "protective sweep," which is incorrect because Mr. Burch had not yet been arrested. Aff. ¶ 17; *see Buie*, 494 U.S. at 330. In fact, the search of the apartment was a limited search pursuant to an arrest warrant.

- The affidavit omits Officer Spacek's initial search of the bed and that an officer shouted "he's not under the bed" prior to Det. Galagher's lifting of the mattress and box spring. *See* Aff. ¶ 17.

- The affidavit incorrectly states that, after being told that the officers planned to search under the bed, Ms. Sims "responded by dropping to the floor on her hands and knees, immediately popping back up, and telling law enforcement that no one was there." *Id.* In fact, her face was pressed to the floor (i.e., she had to get lower than just hands and knees to look under the bed), and she did not say anything after returning to her feet.

- The affidavit only says that CPD "looked under the bed" when it discovered the pistol. *Id.* The structure of the paragraph falsely implies that the officers looked under the bed in the same manner as Ms. Sims (i.e., by dropping to the floor). The affidavit omits that the officers lifted the mattress and boxspring, and that the bedframe was quite low to the ground. *See id.*

- The affidavit falsely suggests that, while they were conducting the search, the officers took a video showing Mr. Burch hiding on the balcony of the unit below Ms. Sims's apartment. *Id.* ¶ 18. In fact, the footage was taken at approximately 7:00 a.m., about 45 minutes after the search concluded. Gov. Resp. *8.

– 12 –

Additionally, Mr. Burch claims that the affidavit is also rendered misleading by the choice to include a photograph of the gun after it had already been moved, rather than in the location where it was discovered, Def. Post-Hr'g Br. *8; *see* Aff. *14; and although the affidavit includes a photograph of a CPD officer lifting the mattress and box spring and pointing to roughly where the gun had been located, Mr. Burch points out that the picture was staged, rather than contemporaneous, dkt. 557 at *14.

### B.    *Intentionality*

Because the Government does not contest that the affidavit contained falsehoods and omissions, the next step of the inquiry is to determine whether Agent Perugini and the agents and officers who supplied him with information made the false statements and omissions intentionally or recklessly. *See United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) ("[T]he validity of the search is not saved if the governmental officer swearing to the affidavit has incorporated an intentional or reckless falsehood told to him by another governmental agent." (citing *United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir. 1984); *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994))). Proving reckless disregard for the truth requires showing more than mere negligence, but it may be inferred from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations." *United States v. Williams,* 737 F.2d 594 (7th Cir. 1984).

The Court first observes that the fact-finding process underlying this affidavit was one that was particularly likely to produce errors. The affidavit was signed by an Agent Perugini, who was not present during the execution of the arrest warrant and had essentially no firsthand knowledge of anything in the affidavit related to the apartment raid. The affidavit was prepared in part by prosecutors, who also were not present during the search of Ms. Sims's apartment, and by Agent Cotiguala, who was present but who appears in the BWC footage to mostly stand off to the side while the CPD officers conducted the search. The actual information in the affidavit comes from the

accounts of the CPD officers, who testified that they did not review the affidavit before it was filed, and also that they did not know who would be signing it. The affidavit was also written in just a few hours, and without any review of the BWC footage. In other words, the affidavit presented to Judge McShain was essentially the product of a giant game of telephone, assembled hurriedly and without review of the most objective evidence available as to what happened (*i.e.*, the BWC footage). These procedures are not conducive to accurate reporting, and it is hardly surprising that the affidavit produced by them contained significant problems. Indeed, the Court finds that the use of such procedures amounts, at the very least, to negligence. *See Whitley*, 249 F.3d at 624 (7th Cir. 2001) (insufficient verification of the accuracy of information can contribute to a finding that an affidavit was prepared with reckless disregard for the truth).

Negligence, of course, is not the same as a reckless disregard for the truth. *Franks,* 438 U.S. at 171. But some of the falsehoods and omissions cannot be explained in the absence of such recklessness. Take, for example, the omission that Officer Spacek looked under the bed and found nothing, prior to Det. Gallagher's later lifting of the box spring. Officer Spacek obviously knew that he looked under the bed. The fact that this was not included in the affidavit could only result from intentional omission of a detail (either by Officer Spacek, or by one of the HSI Agents) that might have undermined a probable cause determination; or from factfinding by Agent Cotiguala that failed to ask all officers thorough questions about their observations and activities related to the only place in the apartment where substantial new evidence was found. This second scenario would show a reckless disregard for the truth, because any such factfinding procedure would plainly be seriously deficient. *See Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) ("Omissions are made with reckless disregard where an officer withholds a fact in his ken that any reasonable person would have known… was the kind of thing the judge would wish to know." (cleaned up) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993))).

Similarly, the prosecutors who helped prepare the affidavit should have known better than to describe the search as a "protective sweep," a criminal law term of art that, as the Government admits, implies that the suspect had already been apprehended. *See* Gov. Resp. *17 ("As an initial matter… BURCH had not been arrested yet by the time the officers look underneath the bed. Thus, the officers' search was not a protective sweep incident to arrest, but a search for a suspect pursuant to a valid arrest warrant."); *Buie*, 494 U.S. at 330. Assistant U.S. Attorneys are and ought to be held to a high standard, and their use of an incorrect term in the area of their legal specialty (criminal law) can only indicate either a deliberate decision to use a term implying a false state of affairs or to recklessly disregard those implications. Similar deficiencies could be found for the other errors noted above. *See* Def. Br. *12–14.

The Government provides no real evidence that all of those involved in the preparation of the affidavit (including the officers who provided the information) were engaged in good faith efforts to provide Judge McShain with all relevant details in their knowledge. True, warrant affidavits are entitled to a presumption of truthfulness and good faith, but that presumption can be defeated with evidence. *Franks,* 438 U.S. at 171. Here, Mr. Burch has shown that the affidavit contained multiple errors related to information that the BWC footage shows was known to the police officers, or related to legal terms of art about which the prosecutors involved, by their own admission, used incorrectly. These falsehoods and omissions related to "the kinds of things the judge would wish to know" can therefore only be explained as intentional or reckless misrepresentations. The Court therefore finds that Mr. Burch has met the intentionality element necessary for *Franks* suppression.

### C. Materiality

Even given the above findings, *Franks* suppression is still only appropriate if the affidavit, once cleansed of misstatements and properly supplemented with omitted information, can still support a probable cause determination. *McNeese*, 901 F.2d at 596. As noted above, probable cause is not a high

standard— It "denotes more than a mere suspicion, but does not require certainty." *United States v. Ellery*, 678 F.2d 674, 677 (7th Cir.). Ultimately a determination of probable cause is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit…, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Here, the affidavit specified that the officers believed a search of Ms. Sims's apartment would reveal evidence of narcotics; drug paraphernalia; money and other financial instruments related to controlled substances; documents containing information about the drug conspiracy, including other members; and firearms. Aff. attach. B at *1–2.

To start, it is clear that not all the errors were material. For example, the Court cannot imagine how correctly identifying the lead building engineer as such, rather than as a building manager, might have affected the probable cause determination. Other errors, however, are more serious.

Mr. Burch argues that, once corrected, the affidavit cannot support a finding of probable cause. He focuses on the degree to which it was "riddled with falsities," Def. Post-Hr'g Br. *9, but he does not advance concrete arguments for why the corrected affidavit cannot support a finding of probable cause. His case seems to hinge on the contention that a magistrate who knew of the errors in the submitted affidavit would be justified in finding the whole thing untrustworthy. *See, e.g.,* Def. Br. *15. And perhaps he is right on that point; but that is not the standard for suppression under *Franks*. The question for this Court is whether a reasonable jurist, when viewing the corrected affidavit, *could* find that probable cause existed to authorize the requested search. *See United States v. Garcia*, 528 F.3d 481, 486 (7th Cir. 2008) (affirming denial of *Franks* suppression because "On balance, we agree that a sensible judge could find that the affidavit here set forth sufficient facts to establish probable cause.") Here, the corrected affidavit still contained evidence of Mr. Burch's drug crimes, evidence that he frequently was located at (and possibly resided at) Ms. Sims's apartment, and evidence that a loaded pistol with a silencer and an expanded magazine was hidden under a bed in that apartment.

These allegations are sufficient when considered together for a reasonable magistrate to say that "there is a fair probability that contraband or evidence of a crime w[ould] be found in" Ms. Sims's apartment. *Gates*, 462 U.S. at 238.

The Court finds that the falsehoods and omissions in the affidavit, though significant and troubling, and made with at least reckless disregard for the truth, were ultimately not material to the probable cause determination. Accordingly, the Court will deny Mr. Burch's motion to suppress the fruits of the search warrant.

## CONCLUSION

Mr. Burch's motion to suppress the evidence collected from Ms. Sims's apartment [515] is denied.

**IT IS SO ORDERED.**

Date: 6/15/2026

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge